## In re AH CHONG.

### (Circuit Court, D. California. June 9, 1880.)

CHINESE TREATY—CONSTITUTION.—The statute of California prohibiting all aliens incapable of becoming electors of the state from fishing in the waters of the state violates the fourteenth amendment of the constitution of the United States, also articles 5 and 6 of the treaty with China, and is void.

*Habeas Corpus.*

*Delos Lake* and *Thos. D. Riordan,* for petitioners.

*A. L. Hart,* Attorney General, for respondents.

SAWYER, C. J. Article 19 of the new constitution of California, headed *"Chinese,"* in addition to the provisions referred to in Parrott's case, recently decided in this court, forbidding the employment of Chinese by any corporation, or on any state, county, municipal, or other public work, also contains the following provision:

"Section 4. The presence of foreigners ineligible to become citizens of the United States is declared to be dangerous to the well-being of the state, and the legislature shall discourage their immigration by all the means within its power. Asiatic coolieism is a form of human slavery, and is forever prohibited in this state; and all contracts for coolie labor shall be void. All companies or corporations, whether formed in this country or any foreign country, for the importation of such labor, shall be subject to such penalties as the legislature may prescribe. The legislature shall delegate all necessary power to the incorporated cities and towns of this state for the removal of Chinese without the limits of such cities and towns, or for their location within prescribed portions of those limits; and it shall also provide the necessary legislation to prohibit the introduction into this state of Chinese after the adoption of this constitution. This section shall be enforced by appropriate legislation."

In obedience to the mandate of the constitution requiring these provisions to be enforced by appropriate legislation, the legislature, besides the act in question in Parrott's case, passed three other acts: One on April 3, 1880, entitled

9*

"An act to provide for the removal of Chinese whose presence
is dangerous to the well-being of communities outside the
limits of cities and towns in the state of California," in
which it is provided that "the board of trustees or other
legislative authority of any incorporated city or town, and
the board of supervisors of any incorporated city and county,
are hereby granted the power, and it is hereby made their
duty, to pass and enforce any and all acts or ordinances or
resolutions necessary to cause the removal without the limits
of such cities and towns, or city and county, of any Chinese
now within, or hereafter to come within, such limits." St.
1880, p. 114. Another act on April 12, 1880, entitled "An
act to prohibit the issuance of licenses to aliens not eligible
to become electors of the state of California," which provides
as follows: "Section 1. No license to transact any business
or occupation shall be granted or issued by the state, or any
county or city, or city and county, or town, or any municipal
corporation, to any alien not eligible to become an elector of
this state. Section 2. A violation of the provisions of section
1 of this act shall be deemed a misdemeanor, and be pun-
ished accordingly." And on April 23, 1880, still another
act, entitled "An act relating to fishing in the waters of this
state," which provides as follows: "Section 1. All aliens
incapable of becoming electors of this state are hereby pro-
hibited from fishing, or taking any fish, lobsters, shrimps, or
shell-fish of any kind, for the purpose of selling or giving to
another person to sell. Every violation of the provisions of
this act shall be a misdemeanor, punishable upon conviction
by a fine of not less than $25, or by imprisonment in the
county jail for a period of not less than thirty days."

All these acts, as well as the acts and constitutional pro-
visions considered in Parrott's case, are *in pari materia*; and,
being so, indicate and illustrate the motive or purpose of the
passage of any one of them. The petitioners in the several
cases, subjects of China, of the Mongolian race, were arrested
for taking fish in San Pablo bay, within the state, and selling
the same in violation of the provisions of the last-named act,
tried and convicted before the proper court, and sentenced to

imprisonment for the period of 30 days. Being imprisoned in pursuance of the judgments, they severally sued out writs of *habeas corpus*, and now ask to be discharged on the ground that their imprisonment is in violation of our treaty with China, commonly known as the Burlingame treaty, and the fourteenth amendment to the national constitution. The attorney general, who appears for the respondent in the interest of the state, does not seek to re-open the question decided in Parrott's case, but he endeavors to distinguish the two cases, and relies upon *McCready* v. *Virginia,* 94 U. S. 391, to support the distinction. Citizens of Maryland were in the habit of crossing over the line into Virginia, and planting oysters in the waters of the latter state. The state of Virginia, desiring to preserve the profits of the business to its own people, passed an act making it an offence for citizens of other states to take oysters from or plant them in the waters of Virginia. McCready was convicted and fined for planting oysters in Ware river, one of the waters of Virginia, in violation of this act. He claimed the act to be void on the ground that it was passed in violation of that provision of the national constitution which says: "Citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." The supreme court held that the right to take fish in the public waters of the state is not a privilege of inter-state citizenship. It held the state to be the owner, subject to the right of navigation, of the tide-lands, and the tide-waters covering them; also of the fish therein, so far as capable of ownership, while running in the waters. The court, speaking by the chief justice, says: "These (the fisheries) remain under the exclusive control of the state, which has consequently the right, in its discretion, to appropriate its tide-waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is, in effect, nothing more than a regulation of the use by the people of their common property. The right which the people of the state thus acquire comes not from their citizenship alone, but from *their citizenship and property combined. It is, in fact, a*

*property right, and not a mere privilege or immunity of citizenship.* 94 U. S. 395. The right of citizens of Virginia to fish in the public waters of the state, therefore, is a *property right* vested in the citizen by reason of his local citizenship and as one of the common owners, and not a mere general privilege; and the title to the property being in the public—in the state—it was held that the state might exclude all others than citizens, the common owners, from enjoying the right. The court further says: "The right thus granted is not a privilege or immunity of *general* but *special* citizenship. It does not 'belong of right to the citizens of all free governments,' but only to the citizens of Virginia, on account of the peculiar circumstances in which they are placed. They, and they alone, owned the property to be sold or used; and they alone had the power to dispose of it as they saw fit. They owned it, not by virtue of citizenship merely, but of citizenship and domicile united—that is to say, by virtue of a citizenship confined to that particular locality." Id. 396.

Citizens of other states having no property right which entitles them to fish against the will of the state, *a fortiori,* the alien, from whatever country he may come, has none whatever in the waters or the fisheries of the state. Like other privileges he enjoys as an alien by permission of the state, he can only enjoy so much as the state vouchsafes to yield to him as a special privilege. To him it is not a property right, but, in the strictest sense, a privilege or favor. To exclude the Chinaman from fishing in the waters of the state, therefore, while the Germans, Italians, Englishmen, and Irishmen, who otherwise stand upon the same footing, are permitted to fish *ad libitum,* without price, charge, let, or hinderance, is to prevent him from enjoying the same privileges as are "enjoyed by the citizens or subjects of the most favored nation;" and to punish him criminally for fishing in the waters of the state, while all aliens of the Caucasian race are permitted to fish freely in the same waters with impunity and without restraint, and exempt from all punishments, is to exclude him from enjoying the same immunities and exemptions "as are enjoyed by the citizens or subjects of the most

favored nation;" and such discriminations are in violation of articles 5 and 6 of the treaty with China, cited in full in Parrott's case. The same privileges which are granted to other aliens, by treaty or otherwise, are secured to the Chinaman by the stipulations of the treaty. Conceding that the state may exclude all aliens from fishing in its waters, yet if it permits one class to enjoy the privilege it must permit all others to enjoy, upon like terms, the same privileges, whose governments have treaties securing to them the enjoyment of all privileges granted to the most favored nation.

The fourteenth amendment of the national constitution provides that "no state shall * * * deny to *any person* within its jurisdiction the equal protection of the laws." To subject the Chinese to imprisonment for fishing in the waters of the state, while aliens of all European nations under the same circumstances are exempt from any punishment whatever, is to subject the Chinese to other and entirely different punishments, pains, and penalties than those to which others are subjected, and it is to deny to them the equal protection of the laws, contrary to those provisions of the constitution. *Parrott's Case,* 21 Alb. L. J. 387, [1 FED. REP. 481;] *Strauder* v. *West Virginia,* 10 Cent. L. J. 227. It is obvious, also, from a consideration of these various provisions of the new state constitution, and the several statutes *in pari materia* referred to, considered in connection with the public history of the times, that the act relating to fishing in question was not passed in pursuance of any public policy relating to the fisheries of the state as an end to be attained, but simply as a means of carrying out its policy of excluding the Chinese from the state, contrary to the provisions of the treaty. The end to be accomplished being unlawful, as we held in Parrott's case, it is unlawful to use any means to accomplish the unlawful object, however proper the means might be if used in a proper case and for a legitimate purpose.

The act is clearly unconstitutional, and a violation of the treaty in discriminating against the Chinese and in favor of aliens of the Caucasian race in all other respects similarly situated. Acts when performed by Chinese are made an

offence punishable by imprisonment, while the same acts, performed in the same manner and under the same circumstances, by other aliens are not an offence; and such other aliens are exempt from the punishments denounced by the law against them. It is impossible, therefore, to say that the Chinese "enjoy the same privileges, immunities, and exemptions" as are "enjoyed by the citizens or subjects of the most favore{ nation," as is stipulated they shall by the treaty, or that the "state," by this act, does not "deny" to them "the equal protection of the laws," contrary to the fourteenth amendment to the national constitution.

While it is not very likely that the act in question was *in fact* intended by its framers to apply to any but Chinese, yet, owing to carelessness in the phraseology used, others than Chinese may have occasion to invoke the national constitution for their protection. The language is: "All *aliens incapable* of becoming *electors* of this state are hereby prohibited from fishing," etc. By article 2 of the constitution the right of suffrage is limited to "*male* persons;" so that all alien women are "*incapalle of becoming electors,*" and, being so, are within the terms of the statute; so that German, French, Italian, English, and Irish women, before becoming citizens, are forbidden to take fish, shrimps, lobsters, oysters, etc., in the waters of California. So, also, under the act of April 12, before cited, it is provided that "no license to *transact any business or occupation* shall be granted or issued by the state, or any county or city, or city and county, or town, or any municipal corporation, *to any alien not eligible to become an elector of the state;*" and the violation of this provision is made a punishable offence. So that, under the terms of this act, it is an offence to grant or issue a "license to transact *any business or occupation*" to any alien Caucasian woman; and alien women of European extraction will be unable to engage in any such "business or occupation" as requires a license. A similar infelicity of expression is found in article 2 of the constitution, relating to the right of suffrage, in which it is provided "that no native of China * * * shall ever exercise the privileges of an elector in this state," without regard

to the race to which he belongs. Many persons of the Caucasian race are natives of China, and probably not a few descendants of citizens of the United States, who would fall within the terms of this provision.

Section 4, article 19, of the state constitution, in obedience to which the act now in question was passed, provides that "the presence of foreigners *ineligible to become citizens* of the United States is declared to be dangerous to the well-being of the state, and the legislature shall discourage their immigration by all means within its power." It certainly cannot be the "ineligibility to become citizens" that renders the presence of foreigners "dangerous to the well-being of the state." If the presence of the Chinese as aliens, intending, dead or alive, to return or be returned to their own country, is objectionable to our citizens as being "dangerous to the well-being of the state," it is not difficult to perceive that their presence as citizens, permanently domiciled and multiplying in the state, would be far more objectionable and obnoxious to the welfare of our people. If ineligibility to citizenship were the only objection, it could easily be obviated by striking the single word "white" from the naturalization laws. Indeed, in the late revision of the statute, the word "white" was inadvertently omitted; but our people made haste to procure its re-insertion by amendment at the earliest opportunity. Thus, from June 22, 1874, to February 18, 1875, Chinese were eligible to citizenship. *In re Ah Yup,* 5 Sawyer, 155. But the people of California were not satisfied with their eligibility, and in deference to their wishes they were again made ineligible to citizenship. So ineligibility to citizenship is not the dangerous or objectionable feature. The real objection is more deeply seated and more substantial. Many believe that the time has come when all naturalization laws should be abolished. Should congress come to entertain that view, and repeal the naturalization laws, *then all aliens* would fall under the ban of this provision of the state constitution.

These various provisions are referred to as instances illustrative of the crudities, not to say absurdities, into which

constitutional conventions and legislative bodies are liable to be betrayed by their anxiety and efforts to accomplish, by indirection and circumlocution, an unconstitutional purpose which they cannot effect by direct means.

The act under which the several prisoners are held being void, for the reasons stated, they are in custody in violation of the constitution and a treaty of the United States, and are entitled to be discharged; and it is so ordered.