SEACOAST PRODUCTS, INC., the New Smith Meal Company, Inc., and Second Oceanic Corporation, Plaintiffs,

v.

James E. DOUGLAS, Jr., Commissioner, Virginia Marine Resources Commission, Defendant.

Civ. A. No. 75–69–NN.

United States District Court, E. D. Virginia.

Argued Oct. 15, 1975.

Decided Nov. 7, 1975.

T. H. Willcox, Jr., Willcox, Savage, Lawrence, Dickson & Spindle, Norfolk, Va., for plaintiffs.

James E. Moore, Asst. Atty. Gen., Richmond, Va., Andrew P. Miller, Atty. Gen., Richmond, Va., for defendant.

Before BRYAN, Senior Circuit Judge, and KELLAM and MacKENZIE, District Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

In question here is the constitutionality of two Virginia statutes restricting the fishing of menhaden in her part of Chesapeake Bay and in the Atlantic Ocean within three miles[1] of her coast. Plaintiffs, Seacoast Products, Inc., The New Smith Meal Company, Inc., and Second Oceanic Corporation, now and for a number of years engaged in such fishing in these areas, sue the Virginia Commissioner of Marine Resources to have these restrictions declared invalid and to enjoin his imposed enforcement of them.[2] Plaintiffs' motion for summary judgment must be sustained.[3]

The two statutes are Virginia Code § 28.-1–60 and § 28.1–81.1. Epitomized, the force of § 28.1–60 is to allow a non-resident a license to fish menhaden "within the three-mile limit" but to exclude *nonresidents* of Virginia from menhaden fishing in the Virginia portion of Chesapeake Bay, while at the same time permitting Virginia *residents* to fish for menhaden in that body of water. The force of § 28.1–81.1 is to exclude any fishing by *aliens* within the three-mile limit off the Virginia coast. Thus non-residence and alienage are the determinant factors in the ban of plaintiffs from a piscary for menhaden.

The challenged provisions, we conclude, "flagrantly and patently" as well as irreparably offend plaintiffs' rights under the Fourteenth Amendment's equal protection clause and under the preemptive and exclusive Federal regulation of sea fisheries. In this context the doctrines of abstention have no place. In other circumstances they are appropriate: to obtain interpretation of a State statute, *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); or to avoid needless interference with the administration of State domestic policies, *Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); or to avoid obstruction of State prosecutions, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); but forbearance of Federal judicial action is not demanded when the deprivation of rights is so severe, clear and damaging as here. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger*, supra, 401 U.S. at 53–54, 91 S.Ct. 746; *Zwickler v. Koota*, 389 U.S. 241, 248, 249–50, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). For the same reasons prior exhaustion of State administrative or judicial remedies is not mandatory. On study of the merits of the complaint we grant the relief it prays.

Plaintiff Seacoast Products is a Delaware chartered corporation with its principal office in New Jersey; Smith Meal is a Massachusetts corporation with its office in New Jersey; and Oceanic is a New York corporation having its principal place of business

---

1. This is known as the 3-mile limit or the jurisdictional belt along the coasts of the ocean bordering States. It was fixed by Secretary of State Thomas Jefferson in 1793 and has been generally accepted internationally. *United States v. California*, 332 U.S. 19, 33, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

2. Jurisdiction is rested on complete diversity of citizenship between plaintiffs and defendant as well as on the presence of a Federal question. 28 U.S.C. §§ 1331, 1332. That the amount involved is in excess of $10,000, exclusive of interest and costs, is not disputed. A three-judge court has been convened in accordance with 28 U.S.C. §§ 2281 and 2284.

3. There are no critical, genuine factual differences between the parties.

in that State. The last two corporations are wholly-owned subsidiaries of Seacoast which in turn is ultimately controlled, through subsidiaries, by Hanson Trust Ltd., a corporation organized and existing under the laws of the United Kingdom. For many years the plaintiff parent and subsidiary corporations have been embarked on menhaden seining in Chesapeake Bay and in the Virginia three-mile ocean belt.

Menhaden are not edible by humans. They are ground into fish meal for poultry feed, fish solubles as ingredients of animal feed, and fish oil for the manufacture in Europe and Canada of margarine. Hence the statutes are not purposed to conserve the food supply of the State. It is conceded by plaintiffs that Virginia could exact from them the same licenses as she required of residents for fisheries in her inland waters. Indeed, plaintiffs have heretofore applied for and been granted the requisite licenses for several years past. However, based on the two Code sections, their applications were denied in May 1975 because of their non-resident status and ultimate British control.

I. Plaintiffs' first point is that since the licenses are granted to Virginia domestic and resident corporations but refused non-resident corporations, there is discrimination in contravention of the Fourteenth Amendment assurance of equal protection of the laws. It cannot be successfully gainsaid that this is in actuality the impact of § 28.1–60.

Particularly exampling the discrimination is the licensing of Zapata Haynie Corporation and Standard Products Company, Inc., both resident corporations of Virginia, to fish menhaden in the areas forbidden non-residents. It is alleged, without contradiction, that Zapata is the largest, Seacoast the next largest and Standard the third largest of such fishers.

Supportive of plaintiffs is *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 419–20, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). It dealt with the denial by a State of a license to a lawfully resident Japanese to earn his living by fishing commercially in ocean waters off her coast. The State action was premised on his ineligibility under Federal law to achieve United States citizenship. In reaching its decision the Court declared the equality in *every* State of all who are lawful residents of *any* State:

> "The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws."

Incidentally, the Court in both *Takahashi*, supra, at 420, 68 S.Ct. at p. 1143, and in *Toomer v. Witsell*, 334 U.S. 385, 401, 68 S.Ct. 1156, 1164, 92 L.Ed. 1460 (1948), declined to treat, as contra, *McCready v. Virginia*, 94 U.S. 391, 24 L.Ed. 248 (1876), upholding the State statute prohibiting "citizens of other States but not Virginia citizens from planting oysters" in her tidal river waters.

■ II. The alienage issue, made by the plaintiffs' attack on Virginia Code § 28.1–81.1, is predicated on the statute's denial of a commercial license to any person, firm or corporation not a citizen of the United States for the taking of any fish from the marginal ocean waters of Virginia. The vitality of that statute, however, has been superseded by an Act of Congress approved May 20, 1964, 78 Stat. 194, 16 U.S.C. § 1081, et seq., declaring as far as pertinent here that "[i]t is unlawful for any vessel, except a vessel of the United States, or for any master or other person in charge of such a vessel, to engage in the fisheries within the territorial waters of the United States . . . .", except upon authorizations not relevant here. In our judgment this legislation preempted Virginia's control of commercial sea fisheries and superseded the State's regulation of them. *Toomer v. Witsell*, 334 U.S. 385, 393, 394, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *United States v. California*, supra, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); *Skiriotes v. Florida*, 313 U.S. 69, 75, 61 S.Ct. 924, 85 L.Ed. 1193 (1941); *Manchester v. Massachusetts*, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891).

**4**

Subsequently, the United States allowed Seacoast's 68 vessels to be documented unconditionally as vessels of the United States, thus rendering them eligible under 16 U.S.C. § 1081 to fish within the Virginia 3-mile limit. The acceptance was ordered by the Secretary of Commerce under the provisions of the Shipping Act, 46 U.S.C. §§ 808, 839. He acted only after a full hearing, at which competing fisheries opposed the approval because of the British interest in Seacoast.

Although it is not an issue here, the evidence is abundant to warrant the documentation. Seacoast is, as heretofore noted, incorporated under the laws of Delaware; it is operated by boards of citizen directors and officers; all the ship officers and crews are also United States citizens. Clearly, Seacoast and its subsidiaries are lawfully fishing in the Virginia waters despite her proscriptive statute.

■ However, the State maintains that the statute is essential to the protection of the State's ocean waters against depredations by citizens of foreign countries or their ships. The argument is that the jurisdiction of the Federal government begins at the farther limit of the 3-mile zone and from there extends to the limit of the new 12-mile sovereignty line of the United States. Virginia concludes that, therefore, she has the duty and power to exercise control within the 3-mile limit. We are unable to agree. The decisions heretofore cited—*Toomer, California, Skiriotes* and *Manchester*, supra—determining Federal jurisdiction over the marginal sea to be superior to the rights of the States also declare that the Federal government has paramount authority in the entire marginal belt, including the 3-mile limit. Accordingly, prevention of incursions by foreigners is the responsibility exclusively of the Federal government.

III. Finally, enforcement of the Virginia statutes uncontestably would inflict irreparable injury upon plaintiffs because of the natural habits of menhaden. Migratory fin fishes commonly swimming on the surface in great shoals or schools, they are taken in purse-nets. From January to March they congregate in the far offshore seawaters from North Carolina to Florida. Beginning in March they run northwardly, as far as Cape Cod. They return in the fall and in January move again far out to sea—later to retrace their March-October path. Only in the summer are they to be found just outshore, when and where, obviously, fishing of them is practicable.

■ Should Virginia press its two statutes—both of which contain severe sanctions for violations—during the summer by the seizure of even one of plaintiffs' ships, since it loads $80,000 worth of menhaden, or by otherwise interrupting plaintiffs' fishing, there would be no recoupment whatsoever for losses occurring during or after the prosecution of the charges, no matter if plaintiffs prevailed at trial. Catches already made would also be lost for the cargoes are quickly perishable. It is reasonable to assume that any such litigation could last for months, certainly into the summer season. These very facts prove the irreparable injury the Court predicted in *Toomer v. Witsell*, supra, 334 U.S. 385, 392, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). "[T]he danger of irreparable loss is both great and immediate." *Fenner v. Boykin*, 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926).

Thus plaintiffs' prayer for an injunction, in addition to a declaration of the invalidity of the Virginia statutes, should be granted restraining the continued refusal of the defendant Commissioner to issue the requisite licenses to plaintiffs.

An order will be entered effectuating this opinion.