JOHN VANDERBILT, appellant,

*v.*

HENRY MITCHELL, medical superintendent; MYRA L. J. VANDERBILT and WILLIAM GODFREY VANDERBILT, respondents.

[Argued March 18th, 1907.  Decided June 17th, 1907.]

1. A certificate of birth, declared by section 13 of the act of 1888 (*P. L. 1888 p. 52*) to be entitled to be received in evidence to prove the facts therein contained, was placed of record with the medical superintendent of the bureau of vital statistics.  The certificate was made by the physician present at the birth of the child, and, as required by said statute, among other things set forth, as far as the facts could be ascertained by him, the date and place of birth of the child, the name of each of the parents, the maiden name of the mother and the name of the child.  In making the certificate the physician was imposed upon by the false statements of the mother as to the paternity of the child, and certified, contrary to the fact, that the complainant was the father of the child.— *Held*, that a court of equity has jurisdiction (1) to cancel such false certificate, or so much thereof as relates to and charges upon the complainant the paternity of the child; (2) to require the medical superintendent of the bureau of vital statistics to endorse the fact of the cancellation

upon the record; (3) to enjoin the use of the original certificate, or copies thereof, as evidence; and (4) to enjoin the mother and the child from claiming for said child, by virtue of said certificate, the status of a lawfully-begotten child of the complainant.

2. Principles on which equitable jurisdiction is entertained in cases of this nature discussed.

3. *Vanderbilt* v. *Mitchell,* *71 N. J. Eq. (1 Buch.) 632,* reversed.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Garrison, whose opinion is reported in *71 N. J. Eq. (1 Buch.) 632.*

The bill in this case is filed by John Vanderbilt against Myra L. J. Vanderbilt, his wife, William Godfrey Vanderbilt, an infant, appearing herein by guardian, and Henry Mitchell, as medical superintendent of the bureau of vital statistics of the State of New Jersey.

The complainant charges that he is the husband of the defendant Myra L. J. Vanderbilt; that they were married in this state in February, 1901, and then were, and are now, residents of this state; that they lived together as man and wife for two months after the marriage, and no longer; that from September, 1901, to July, 1903, the wife and a third party named lived together in adultery at a place designated in the bill, and that during said period complainant had no matrimonial access to his wife; that as a result of the adulterous intercourse there was born to the said wife, in the State of New Jersey, on or about the 20th day of October, 1903, a male child, by her named William Godfrey Vanderbilt, which infant is one of the defendants herein; that the complainant is not the father of the child, but that the infant is an adulterine bastard.

The bill charges that the defendant Myra L. J. Vanderbilt, upon the birth of said infant, falsely stated to the attending physician that the complainant was the father of the child, and that the child was the lawful issue of said marriage between herself and the complainant; that she made these false statements to induce the physician to insert them in the birth certificate, which the physician did, transmitting the certificate to the bureau of vital statistics, where it was duly filed and recorded.

The further allegation is that the defendant Myra L. J. Vanderbilt, by *ex parte* statements, created a public record false in fact, but evidential "in any court of this state to prove" that the complainant is the father of the infant defendant; that under and by virtue of this fraudulent record both the mother, and the child through its mother, assert and seek to maintain for the said child all the rights of a legitimate son of the complainant, and to enforce all the liability of the complainant to the said infant, as if he were the lawfully-begotten son of the complainant.

The bill also avers, in adequate terms, the existence of a testamentary trust created by the mother of the complainant, by the terms of which certain real property in the State of New York is vested in certain trustees, from which the complainant receives an income during the lifetime of his nephew and his niece, and at the decease of both the nephew and the niece, under the provisions of the existing trust as stated in the bill, the *corpus* of the estate is to be distributed to certain persons, in which distribution the complainant, if alive at the time, or otherwise his lawful heirs or devisees, would share.

The allegation is that the complainant is sick, infirm and stricken with a fatal illness, and that it is the purpose of the defendants, the wife and the infant, to use this record, false in fact, after the death of the complainant and loss of testimony, to enable the infant to assert his claims to property as the lawful heir of the complainant.

The relief sought is the cancellation of this fraudulent record and the destruction of its evidential character as to the paternity of the infant; in effect, a decree of nullity as to this status of parentage thus *prima facie* created and fraudulently recorded against the complainant. The complainant seeks a permanent injunction restraining both the mother and the child from claiming, under this certificate, for the said child, the status, name, property or privilege of a lawfully-begotten child of the complainant.

An injunction is also prayed for against the issuing, by the state medical superintendent, of copies of this fraudulent record, and against Myra L. J. Vanderbilt and William Godfrey Vanderbilt from using or offering in evidence the record, or certified

copies thereof, or in any way availing themselves of its evidential character.

The court below sustained a demurrer to the bill, on the ground that the case did not fall within any recognized head of equity jurisprudence, that no property right is shown to be involved, and that a court of equity could not take cognizance of personal rights or redress personal wrongs not affecting property.

*Messrs. McDermott & Enright,* for the appellant.

*Mr. Leroy A. Gibby* and *Mr. Harry V. Osborne,* for the respondents.

The opinion of the court was delivered by

DILL, J.

No one of the allegations of the bill of complaint presents an exception to the general rule that the facts alleged must be regarded as admitted under a demurrer, as must all the facts which can be implied by a reasonable and fair intendment.

A court of equity is the only tribunal which can afford adequate relief to the complainant under the peculiar and somewhat novel circumstances of this case, and that regardless of whether *certiorari* or *mandamus* would afford him relief in certain respects.

The complainant properly invokes the aid of a court of equity, on the ground of its inherent jurisdiction over frauds, to annul and cancel a fraudulent certificate, based upon the false statements of the wife as to the paternity of the child, filed by a public officer, which certificate, by force of the statute, has such evidential character that it is *prima facie* evidence of the facts therein contained, and which, unless attacked by competent evidence, becomes conclusive to prove the facts therein recorded.

As we view the *gravamen* of the bill, the complainant does not seek a decree dissolving any existing valid status, thereby altering the actual relation of the parties, but a judicial determination of the matter of the alleged status of paternity *prima facie*

created by this certificate, to determine that such alleged status does not exist and to give adequate relief.

In other words, the theory upon which the equity of the bill rests is not to establish a status, or, on the other hand, to disestablish a status, except for the special object of determining whether the information given to the physician by the wife was fraudulent, and whether thereupon the certificate itself, so far as it imputes to the complainant the paternity of the child, was fraudulent.

The relief sought is a decree expunging from the public records of this state, on the ground of fraud, the certificate of birth, or so much thereof as relates to and charges upon the complainant the paternity of the child, with an injunction against all parties who might issue copies or use such copies or the original certificate as evidence of such paternity.

The character of the recorded certificate, by whom prepared and filed, and its force and effect as evidence, are fixed by statute. *P. L. 1888 p. 52.* See, also, *P. L. 1900 p. 370 ch. 150 §§ 28, 29.*

The act of 1888, requiring the filing of certificates of birth, makes it the duty of the attending physician, within thirty days after a birth, to make, and cause to be transmitted to the super-intendent of the bureau of vital statistics, a certificate thereof, which certificate shall set forth particularly, as far as the facts can be obtained by the physician, among other things, the date and place of birth, the name of each of the parents, the maiden name of the mother, the name of the child, and the name of the attending physician, and by section 13 of this act it is provided that

"any such original certificate, or any copy thereof certified to be a true copy under the hand of said medical superintendent, shall be received in evidence in any court of this state to prove the facts therein contained."

It is important to note that the legislature evidently had not in mind the possibility that this statutory record might be made an instrument to effectuate a fraud. Section 11 of the act of 1888 (*P. L. 1888 p. 59*) provides that any minister of the gospel, magistrate, physician, midwife, or other person, who shall knowingly make any false certificate of marriage, birth or death,

shall be deemed guilty of a misdemeanor, but there is an absence of statutory provision for the correction, modification or annulment of the record in case either of fraud or mistake.

As to the force and effect of the certificate, whether it is an adjudication by the physician of the facts which it recites, or whether it is a mere statement by such physician of facts which have been recited to him, is unnecessary for us to determine. If it be an adjudication, then, so far as the determination of the father of the child is concerned, it was obtained by a false representation made to the officer by the mother. If, on the other hand, it is a mere recital by the physician of a statement made to him by the mother, then that false statement has, by force of the statute, become spread upon the record of the state as the truth.

In either event, the complainant has been fraudulently recorded as the father of this child, and the recorded statement is evidential against him in all matters where the question of the paternity of the child is involved. In an action to compel him to support the child, or an action for necessaries furnished to the child, a certified copy of this record would be *prima facie* evidence that would tend to establish his liability, not only in this state, but in other jurisdictions as well. Speaking generally, this certificate is also evidence upon the question of who shall inherit an individual's estate, a question of vital importance to every man, having also a direct bearing upon the possible issue of a second marriage should he desire to contract one. But with this topic we deal later.

Upon the question of equity jurisdiction it may be said that the jurisdiction of a court of equity to cancel, annul and set aside judgments on the ground of fraud, as well as certificates and determinations of public officers charged with judicial or executive functions, is settled:

The principle is well stated in *Johnson* v. *Towsley, 13 Wall.* (*U. S.*) *72,* as follows:

"There has always existed in the courts of equity the power in certain classes of cases to inquire into and correct mistakes, injustice and wrong, in both judicial and executive action, however solemn the form which the result of that action may

assume, when it invades private rights, and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown, or other executive branch of the government, have been corrected or declared void, or other relief granted."

It was held in *Garland* v. *Wynn, 20 How. (U. S.) 6,* that courts of equity have power to review a contested claim to a right of entry to land under the Preemption laws, and to set aside the decisions of the register and receiver, confirmed by the commissioner in a case where they have been imposed upon by false swearing.

Jurisdiction in equity was also entertained to set aside an adjudication of a register authorizing an entry upon land on proof "showing that the entry was obtained by fraud and the imposition of false testimony on those officers, as to settlement and cultivation." *Lytle* v. *State of Arkansas, 22 How. (U. S.) 193.* See, also, *Dringer* v. *Receiver of Erie Railway, 42 N. J. Eq. (15 Stew.) 573; Kirkpatrick* v. *Corning, 40 N. J. Eq. (13 Stew.) 241.*

Where a public record is pronounced fraudulent, the relief is not confined to an injunction forbidding its use, but the decree may direct a cancellation of the record upon the face thereof. *Fenton* v. *Way, 44 Iowa 438; Jones* v. *Porter, 59 Miss. 628; Randozzo* v. *Roppolo, post.*

An officer making or having in his possession the record may be made a party to a suit to set it aside, although he is not charged with any fraud and is faithfully performing his public duties, and may be enjoined by the decree.

In *McClurg* v. *Terry, 21 N. J. Eq. (6 C. E. Gr.) 225,* the complainant sought a decree declaring that there was no marriage. The justice of the peace "meditated returning a certificate of the marriage to be recorded before the proper officer." The bill sought not only "to have the marriage declared a nullity," but also "to restrain the justice from certifying it for record" (*p. 227*).

It may be conceded that the public officer has faithfully performed his public duties, and yet the certificate or determination

or patent or judgment may be tainted with fraud by the iniquity of private parties.

The jurisdiction of the court of chancery in cases of fraud is as broad and far-reaching as the forms, the devices and the ramifications of fraud can extend, and no public record will be allowed to stand as evidential in the face of facts showing in a direct proceeding in a court of equity that the certificate is false, conceived in fraud and with deliberate intent to use it in the future to wrongfully establish the paternity of a child, create a liability for maintenance and support, and rob the lawful heirs of a decedent of their inheritance.

If the court has jurisdiction to set aside adjudications of judicial officers on the ground of fraud, it necessarily follows that a public record, the essential facts of which are obtained by *ex parte* statements, without the sanction of an oath, and prepared by an officer, whether performing a ministerial or judicial function, may be annulled and rendered innocuous by a decree of a court of chancery, especially where private rights are invaded and where the forms of law are used to perpetrate a fraud, establish an unfounded claim or injuriously affect or threaten future vested or contingent estates.

A well-recognized jurisdiction of a court of equity is to compel the surrender and cancellation of instruments, such as notes, where they have been procured by fraud. It cannot be that a court of equity has jurisdiction, on the ground of fraud, to compel the cancellation of an obligation for the payment of a specified sum of money, and has not the power to compel the cancellation of an instrument, by fraud made a public record, which unjustly places upon the complainant the burden of a *prima facie* status of paternity and exposes him to the liability to support and maintain the infant.

The complainant is entitled to be relieved of the fictitious status of father so far as it is *prima facie* created by this certificate, and which may reasonably be presumed to impose burdens upon him, both present and future. To prevent the injustice of his being forced to pay unfounded claims out of property either acquired or to be acquired, and to obviate the necessity, on the part of the complainant or his heirs, of meeting from

time to time, in various suits and proceedings, this same issue, viz., the validity and evidential force of this certificate, equity interferes *in presenti,* on the doctrine of *quia timet,* that at some time in the future, after the death or departure of witnesses or other loss of evidence, the party or his privies may be menaced by the outstanding instrument.

The effect of a decree of nullity in this case, when entered upon the record, would be notice to all the world that this public record was fraudulent and was not entitled to be received in evidence in any court of this state to prove the facts therein contained, or entitled to full faith and credit in other states under the federal constitution.

The question in this case is not whether the court of chancery would have power, upon a bill properly framed, to determine that the complainant was not the father of the child, so as to preclude forever a trial of that question. The issue here is narrower, and the effect of a decree cancelling the birth certificate, finding that the statements of the wife to the physician that the complainant was the father of the child were false, would not forever preclude a trial of the question of paternity. The effect of the decree would be to destroy the evidential character of this certificate, so that no one would be entitled thereafter to use it as evidence upon such issue.

The equity, so far as we are now discussing it, stops with the destruction of the fraudulent piece of evidence and with an injunction against its use.

In this state, in the leading case of *Carris* v. *Carris, 24 N. J. Eq. (9 C. E. Gr.) 516,* the court of chancery is declared to have inherent jurisdiction to annul the status of marriage on the ground of fraud, entirely independent of the statute of New Jersey which regulates the subject of marriage and divorce. The same principle was followed by Chancellor Zabriskie in *McClurg* v. *Terry, supra;* by Vice-Chancellor Pitney in *Rooney* v. *Rooney, 54 N. J. Eq. (9 Dick.) 231,* and by the present chancellor in *Crane* v. *Crane, 62 N. J. Eq. (17 Dick.) 21.*

In these cases jurisdiction was assumed upon the ground that marriage is a civil contract and that courts of equity have always entertained suits to set aside contracts on the ground of fraud.

We have referred to the doctrine of the *Carris Case,* and have cited with approval the *McClurg, Rooney* and *Crane Cases,* as illustrating the view which our courts take of the doctrine of equitable jurisdiction as contradistinguished from the narrower English rule.

The rule of the *Carris Case* has been generally followed in this country, but in England it has been discussed and squarely rejected. *Moss* v. *Moss, L. R. Prob. 263 (1897).*

The court below held that the remedy of establishing and destroying personal status does not belong to the original jurisdiction of chancery, and, so far as it exists, is wholly of statutory origin. This is supported by certain English decisions, but is contrary to the principle laid down in the *Carris Case* and is not the law of this state.

Therefore, although this status of the complainant is an issue, the court of chancery, independent of any statute, has jurisdiction.

If it appeared in this case that only the complainant's status and personal rights were thus threatened or thus invaded by the action of the defendants and by the filing of the false certificate, we should hold, and without hesitation, that an individual has rights, other than property rights, which he can enforce in a court of equity and which a court of equity will enforce against invasion, and we should declare that the complainant was entitled to relief, and to a decree establishing the truth as to the paternity of the child, relieving the complainant of the intolerable burden *prima facie* put upon him by the false record and preventing the wife from perpetuating a fraud upon the husband. *Pavesich* v. *New England Life Insurance Co., 122 Ga. 190,* adopting the dissenting opinion of Justice Gray, and rejecting the doctrine laid down by the majority in *Roberson* v. *Rochester Folding Box Co., 171 N. Y. 538,* a case seldom cited but to be disapproved, the force of which was subsequently removed by statute. *Laws of N. Y. 1903 p. 308 ch. 132.*

But it is not necessary to place the decision upon this ground, because there are sufficient facts presented to enable us to put this case upon the technical basis that the jurisdiction we are exercising is the protection of property rights, and to declare that

the complainant is entitled to restrain the unwarranted use of his name as the father of the child upon the ground that such action is calculated to injure his property, and the probable effect of it will be to expose him to risk or liability.

In many cases courts have striven to uphold the equitable jurisdiction upon the ground of some property right, however slender and shadowy, and the tendency of the courts is to afford more adequate protection to personal rights and to that end to lay hold of slight circumstances tending to show a technical property right. See *note, 37 L. R. A. 787.*

It sufficiently appears that the complainant's property rights now existing, and the contingent interest of himself and of other parties, are seriously menaced by the unlawful and unwarranted use of the complainant's name as the father of the child in the recorded birth certificate.

It is indisputable that the complainant is now subject to the risk of liability for the support and maintenance of the infant. If, through the mental incapacity of the complainant, or in case of his death, inability or neglect to produce evidence of facts as to the paternity of the child, the certificate of birth should not be contradicted, it would afford evidence of the facts therein contained and the complainant's liability would become fixed.

The complainant is confronted with the risk of prosecution during his lifetime, and with a strong probability of litigation over his will or his property in case of his death. If a court of equity may interfere to prevent the unlawful use of a person's name in a case where there is no evidence of actual fraud, how much more should the court assume jurisdiction in a case of actual fraud involving moral turpitude.

The jurisdiction of a court of equity to interfere where there has been an unwarranted use of a man's name, the probable effect of which is to expose him to risk of future liability, has been sustained by authority. In England the court of chancery, even under the more restricted rule that there prevails, sustained an injunction to restrain the unauthorized use in a prospectus of a man's name as a trustee of a corporation. *Routh* v. *Webster, 10 Beav. 561.* The unauthorized use of the name of "The Times" newspaper in London was also restrained by parties engaged in

the sale of cycles. *Walter* v. *Ashton, L. R. 2 Ch. Div. 282 (1902)*.

In each of these cases an injunction was granted because the unauthorized use of the plaintiff's name was calculated to injure his property and to expose him to risk of future liability. In neither case was a present property right actually prejudiced, but only threatened and liability only anticipated.

In *Routh* v. *Webster, supra,* the master of the rolls, Lord Langdale, said:

"I think that the plaintiff is entitled to the injunction. I have no doubt that the plaintiff never did consent to be a trustee. * * * The name of Mr. Routh, who desired to have nothing to do with this concern, has been published to the world as a trustee; his name was also used at the bankers; and though he may not be subjected to the duties of trustees, yet it is plain that he is exposed to some risk by the unauthorized act of the defendants in using his name."

In *Prudential Assurance Co.* v. *Knott, L. R. 10 Ch. Ap. Cas. 142 (1875)*, Lord Cairns approved *Routh* v. *Webster* in these words:

"That case appears, if I may say so, to have been quite rightly decided. The difficulties in which the plaintiff might have been placed * * * are obvious, and he was held entitled to restrain, not any libel, for there was no libel, but that improper and unauthorized use of his name."

In *Walter* v. *Ashton, supra,* Justice Bryne said:

"The principle is clear enough; the court does not grant an injunction to restrain the use of a man's name simply because it is a libel or calculated to do him injury; but if what is being done is calculated to injure his property, and the probable effect of it will be to expose him to risk or liability, then, if I rightly understand the law of this court, an injunction is the proper remedy."

Furthermore, this case comes within the well-settled rule that a court of equity will prevent the threatened invasion of property rights and protect a party from exposure to the risk of litigation and liability.

It is clear that the complainant has a property interest under

his mother's will in certain specific real estate in New York City, consisting not only of an income for life, but of a vested remainder in a certain undivided share of the real estate in question.

This vested remainder is, under the real property law of New York, as a future estate, descendible, devisable and alienable in the same manner as an estate in possession. *Real Prop. L. (N. Y.)* §§ *26, 27, 30, 49.*

There is more than a "tangible probability," to use the phrase employed in *Walter* v. *Ashton, supra,* that a claim will be made by or in behalf of the infant upon the estate of the complainant in the event of his death, whether he leaves a will or dies intestate. His right to make absolute disposition of his estate by will is menaced by the fraudulent record. His property is exposed to the risk of litigation after his death to the detriment of his lawful heirs.

If he desires to leave his property, as an entirety, under the law of New York, where the land is situated, to charity, by making a devise to any benevolent or charitable society or institution his will may be attacked, not upon any ground of mental incapacity, but upon the ground that he has devoted more than one-half part of his estate to a charitable institution, in violation of the statute of New York, which prohibits such a disposition where a person leaves a husband, wife, child or parent. See *Rev. Stat. of N. Y. (Birdseye's ed., 1901, vol. 3) tit. "Wills,"* § *25 p. 4022.*

The *jus disponendi* of a testator is a property right (*O'Neill* v. *Supreme Council, American Legion of Honor, 70 N. J. Law (41 Vr.) 411*); and one which should be protected by a court of equity from a threatened or anticipated attack.

The court below suggested that the inherent power of a father to make a will would protect him against this contingency. With this we cannot agree. Courts not infrequently set aside wills on the application of heirs-at-law, and this infant defendant, in attacking the will of the complainant, might succeed in having it set aside on the ground of the complainant's insane delusion in believing him to be the son of another, as was attempted in the case of *Smith* v. *Smith, 48 N. J. Eq. (3 Dick.)*

*566,* and might prove that this was a delusion by the production of the very record which is now attacked.

If he dies without lawful issue he may dispose of his property absolutely, but the New York statutory limitation above referred to, if he gave all of his estate to charity, might be used by the infant to invalidate his full intention, wholly independent of any question of mental incapacity or undue influence.

If he dies intestate, the child may institute an action of ejectment against his heirs, and subject them to litigation, when witnesses are dead or other evidence unavailable to contradict the certificate of birth.

The rights of his heirs-at-law should not be overlooked. The complainant is under the strongest moral obligation to leave no taint upon the inheritance, if by any act of his he can blot out the stain and prevent false and fraudulent claimants from obtaining possession of his property, to the exclusion of his relatives by blood.

The absence of precedents or novelty in incident presents no obstacle to the exercise of the jurisdiction of a court of equity.

The case presented is novel in incident, but not in principle; but it is no objection to the exercise of jurisdiction that in the ever-changing phases of social relations a new case is presented and new features of wrong are involved.

As said by Lord Hardwicke, in his letter to Lord Kames on the principles of equity, dated June 30th, 1759:

"Fraud is infinite, and were a court of equity once to lay down rules, how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped and perpetually .eluded by new schemes which the fertility of man's invention would contrive." *Parkes' Hist. Ct. Ch. 508.*

Chancellor Cottenham, in *Wallworth* v. *Holt, 4 Myl. & C. 619,* said:

"I think it the duty of this court [meaning equity] to adapt its practice and course of proceeding to the existing state of society, and not by too strict an adherence to forms and rules, established under different circumstances, to decline to admin-

ister justice and enforce rights for which there is no other remedy."

Paraphrasing the language of Justice Herrick, in *Green Island Ice Co.* v. *Norton, 105 App. Div.* (*N. Y.*) *331*, the jurisdiction of equity is constantly growing and expanding, and relief is now granted in cases where formerly the courts would not have thought for a moment of so doing. From time immemorial it has been the rule not to grant equitable relief where a party praying for it had an adequate remedy at law, but modern ideas of what are adequate remedies are changing and expanding, and it is gradually coming to be understood that a system of law which will not prevent the doing of a wrong, but only affords redress after the wrong is committed, is not a complete system, and is inadequate to the present needs of society.

As for precedents: In a New York case the defendant, having procured from his wife, by fraud, a confession on her part of adultery, commenced an action to divorce her, upon the ground of that adultery. The wife invoked the equitable jurisdiction of the court to restrain the use of such confession as evidence in the then pending divorce action. The statute of New York at that time forbade husbands and wives to be sworn as witnesses in actions for divorce upon the ground of adultery, and hence, the wife would not have been able, in the divorce action, to overcome the evidential effect of the written confession by showing that it was procured by fraud and duress. A demurrer was interposed in the equity suit, upon grounds similar to those urged here, viz., that there was no head of equity jurisdiction under which such relief could be granted, and that there was no basis for the interposition of equity to enjoin the use of the written confession, or any copies thereof, as evidence. The court overruled the demurrer, and the opinion of that eminent jurist, the late Mr. Justice Van Brunt, is not only interesting, but pertinent as holding to the contrary of the ruling below in the case at bar. The court held that novelty in incident was no barrier to equitable jurisdiction; that if such were the rule, gross injustice, under the guise of forms of law, might be perpetrated, and further, that it was quite within the power of a court

of equity, in case of fraud, to broadly restrain the use of documents as evidence. *Callender* v. *Callender, 53 How. Pr. (N. Y.) 364, 365;* see *Meldrum* v. *Meldrum, 11 L. R. A. 65, 70.*

We find in New York also a case where a woman went through the form of a marriage ceremony with a man who personated the plaintiff. This was done at the instance of the woman. The priest performing such marriage ceremony filed his certificate of a marriage between the woman and the plaintiff with the bureau of vital statistics, and thereupon the woman obtained a transcript of such record, and caused the same to be lodged and filed with the authorities in the province of the plaintiff's birth in Italy. The purpose of the woman was to claim, at some time in the future, to be the plaintiff's wife, or his widow after his death. These were the findings of fact of the supreme court.

The plaintiff brought his action in equity, and made parties defendant the woman, Francesca Roppolo, and Thomas Darlington, as commissioner of health of the city of New York, who was, under the law of New York, the custodian of the records of marriages.

The statute of New York relating to the making and filing of marriage certificates (*2 Birdseye's Rev. Stat. 2810* § *22,* as amended by the *Laws of 1904 p. 991 ch. 392*) is, in essential particulars, the same as the statute of New Jersey (*P. L. 1888 p. 52*), and the marriage certificate had practically the same evidential character as the birth certificate in this case.

The supreme court held (opinion by Justice Maddox) that the case was within the jurisdiction of a court of equity, and judicially determined and decreed that the plaintiff was not, as stated in the certificate filed, married to the defendant; that, as to the plaintiff, the pretended marriage was a nullity; that

"the defendant Francesca Roppolo be and she hereby is perpetually restrained and enjoined from claiming or representing herself to be the wife of the plaintiff herein, or from claiming any right and interest in and to his property and estate; * * * the defendant Thomas Darlington, as commissioner of health of the city of New York, be and he hereby is directed to endorse upon the said certificate of marriage a reference to this decree." *Randozzo* v. *Roppolo* (*New York Supreme Court, Kings County*), not yet reported; judgment entered July 14th, 1906.

This case carries with it not only the weight of a precedent, but shows the tendency of courts of equity to intervene to prevent the infringement of personal rights.

Finally, the technical basis of the jurisdiction we are exercising is the protection of property rights. The equitable character of the action itself requires us to regard comparatively remote and trifling interferences with such property rights in the light of the great and immediate interference with the personal rights of the complainant, although, as we have already stated, whether this bill might not be rested on such personal basis alone, without reference to the technical protection of property, is not now decided, because the present case does present the property feature to an extent sufficient to satisfy even the rule adopted by the court below.

Upon the whole case, we are of the opinion that the court of chancery has jurisdiction to afford the complainant ample and complete relief, as already indicated in this opinion; that, should the court of chancery refuse relief under the circumstances stated in the bill, it would cease to be a court of equity governed by principles of natural justice, especially where property rights may be said to be threatened and personal rights are clearly invaded.

The decree sustaining the demurrer is reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, FORT, HENDRICKSON, PITNEY, SWAYZE, REED, TRENCHARD, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL—14.