IN THE MATTER OF THE ADOPTION OF A CHILD BY L. C.
AND E. R. C., HIS WIFE.

Argued October 6, 1980—Decided February 3, 1981.

*James M. Piro* argued the cause for appellants L. C. and E. R. C. (*Piro & Zinna,* attorneys; *David M. Paris,* on the brief).

*Charlotte Kitler,* Deputy Attorney General, argued the cause for respondent State Registrar of Vital Statistics (*John J. Degnan,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

In this case the adoptive parents of a foreign-born child seek a court-ordered change of birthplace on the child's birth certificate. *N.J.S.A.* 26:8–40.1 provides that

[u]pon application by an adopting parent or parents *of any person born in the United States* and adopted pursuant to the laws of this State, the court before which the adoption proceedings have been conducted, may, *for good cause shown,* direct and order that the place of birth shall be the residence of the adopting parent or parents at the time of said adoption; provided however, that the adopting parent or parents were residents of this State at the time of said adoption. [emphasis added]

The questions presented in this case are: first, what constitutes "good cause" for a change of birthplace and, second, whether the statutory exclusion of foreign-born adoptees impermissibly discriminates against aliens in violation of the Equal Protection Clause of the federal Constitution.

The trial court denied plaintiffs' motion to change the birthplace for failure to show good cause. The Appellate Division affirmed, 171 *N.J.Super.* 553 (App.Div.1979), and we granted plaintiffs' petition for certification. 84 *N.J.* 409 (1980). Although we find that plaintiffs have shown good cause for a change of birthplace, we affirm the denial of their motion because the statute excludes foreign-born adoptees and we find such an exclusion constitutionally permissible.

I

In 1977 L.C. and his wife adopted a two-year-old child, M.C., who was born in Portugal. Besides ordering the adoption and

change of the child's name, the judgment of adoption entered by the Probate Division ordered "that pursuant to *N.J.S.A.* 26:8–40.1, the State Registrar shall issue a new birth certificate stating the said adopted child's birthplace as the residence of the Plaintiffs, adoptive parents." [1]   When L.C. presented the judg-

---

[1]*N.J.S.A.* 26:8–40.1 specifies the procedure for issuing a new birth certificate for an adopted child and the content of the new certificate:

When any person born in New Jersey who has been adopted pursuant to provisions of the laws of any State or country, and which adoption has been certified to the State Registrar as required by paragraph B of section 15 of P.L.1953, chapter 264 (C.9:3–31) or there is submitted a certification or a certified copy of the decree or judgment of the court in such adoption proceedings, the State Registrar shall establish, in lieu of the original birth record, a certificate of birth showing (a) the name of the adopted person as changed by the decree of adoption, if changed, (b) the date and place of birth, (c) the names of the adopting parents or parent including the maiden name of the female adopting parent if such name is given in the certification or certified copy of the decree or judgment of the court, and (d) the date of filing.   In any instance where the child has been adopted by the spouse of the natural parent the name of such parent shall also be entered on the new certificate of birth.   Such certificate shall be of the same general type as is used in making a birth certificate for a person who has not been adopted.   Upon application by an adopting parent or parents of any person born in the United States and adoption pursuant to the laws of this State, the court before which the adopting proceedings have been conducted, may, for good cause shown, direct and order that the place of birth shall be the residence of the adopting parent or parents at the time of said adoption;   provided however, that the adopting parent or parents were residents of this State at the time of said adoption.

Upon receipt of such application, certification or certified copy of the decree or judgment of a court in an adoption proceeding, the State Registrar shall make a new certificate of birth containing the information referred to in the preceding paragraph.   The fee for such service shall be $3.00 which includes the issuance of a certified copy of the new certificate.

The State Registrar may file such a new certificate for any foundling, for any child born in any State or country, and for any child for whom an original birth report cannot be located, who has been adopted in New Jersey;   provided, that there is attached to the degree or judgment of the court in such adoption proceeding or is submitted to the State Registrar a certified copy of the original birth record or acceptable evidence of birth. In the case of a foundling, the date and place of birth may be decided by

ment to the State Registrar and requested a new birth certificate for the child showing L.C.'s residence as the place of birth, the Registrar refused to comply fully with the judgment. The Registrar contended that *N.J.S.A.* 26:8–40.1 does not permit the issuance of a certificate showing the adopting parents' residence as the place of birth if the adopted child was born outside the United States. Therefore, the Registrar issued a birth certificate designating Portugal as the birthplace and indicating that L.C. and his wife are the child's parents "by adoption," as the statute requires.[2]

Plaintiffs moved for an order enforcing the judgment. Before the motion was heard, it was ascertained that the challenged portion of the judgment was the result of an administrative error. The judgment was then vacated because it was contrary to the terms of *N.J.S.A.* 26:8–40.1. A second judgment was entered omitting the order for a change of birthplace.

After entry of the new judgment, plaintiffs filed a motion requesting a change of birthplace on the child's birth certificate. They furnished an affidavit by L.C. in which he stated reasons for seeking the change. He described his fears about the

---

the adopting parent or parents if not decided by the court before which the adoption proceedings were conducted. Such certificate for any child who is not a citizen of the United States shall bear the notation "by adoption," which shall also be shown upon any copy of the certificate issued; such notation may be removed at any subsequent date upon submission of acceptable proof that the child has become a citizen of the United States.

[2] *N.J.S.A.* 26:8–40.1 permits the removal of the designation "by adoption" from the birth certificate of an alien child upon proof that the child has become a citizen of the United States. This classification is not challenged here, perhaps because M.C. is now eligible for naturalization under 8 *U.S.C.A.* § 1434(a)(3) (1970), which permits children adopted by citizens to be naturalized upon petition of the adoptive parents after two years of continuous residence in the United States in the custody of the parents. M.C. entered the care of her adoptive parents on June 16, 1976.

*N.J.S.A.* 26:8–40.1 does not allow a change of birthplace at the same time that the "by adoption" designation is removed.

psychological trauma and social stigma that his daughter might endure if people with whom she is associated learn about her true birthplace. In his view, this potential for emotional harm constitutes "good cause" for a court-ordered change of birthplace. The plaintiffs also argued that the statute denies equal protection to foreign-born children, if it is read to permit only children born in the United States to obtain the benefit of a change of birthplace. The Attorney General appeared on behalf of the State Registrar to defend the constitutionality of the statute.

After hearing argument, the trial court denied plaintiffs' motion on the ground that they had not shown the necessary "good cause." The court found the possibility of emotional and developmental harm too speculative, concluding that although their daughter might well be exposed to "the normal strains and ethnic slurs which all of us have had to endure at one time or another," it was highly unlikely that any special difficulties would arise because of M.C.'s foreign birth "which would be so greatly to her detriment that the fears of her father will . . . be realized." Because the plaintiffs had failed to meet the requirement of showing good cause, the court found it unnecessary to consider plaintiffs' constitutional argument.

The plaintiffs then appealed to the Appellate Division, raising essentially the same arguments. The Appellate Division affirmed the denial of plaintiffs' motion. 171 *N.J.Super.* 553 (App.Div.1979). The court agreed with the trial court's finding that good cause had not been shown and, therefore, declined to address the equal protection claim.

We affirm, but for different reasons.

## II

*N.J.S.A.* 26:8–40.1 permits a court to order a change of birthplace on an adopted child's birth certificate if good cause is shown. The plaintiffs and the trial court agreed that this provision is intended as a means of concealing the fact of

adoption from the adopted child and anyone else who sees the birth certificate. They disagreed as to what kind of possible harm to the child constitutes "good cause."

The plaintiffs described the emotional harm to M.C. that might result from premature or accidental disclosure of their child's adoption. Although L.C. intends to tell his daughter about the adoption some day, he wants to wait until he believes she is emotionally ready. He fears that a third party who learns of her adoption from the birth certificate will inform her at an inopportune time, thus risking emotional trauma and permanent psychological harm. L.C. also fears that his daughter will be the victim of prejudice at the hands of school officials or her peers if they learn of her foreign birth. Finally, there is a chance that someone, after learning of M.C.'s birthplace, will inform her natural parents of her present home.

The trial court referred to these concerns as "the citing of shadows." It refused to accept L.C.'s contention that an adopted child in a stable environment is likely to experience emotional trauma upon learning she is foreign-born. Since the possible harm to the child was so speculative, the court found that such harm could not be "good cause." It suggested that the likelihood of emotional harm would have to be stronger or the reasons for concealing the child's origins more compelling, citing birth from an incestuous relationship as an example.

■ We disagree with the narrow view of "good cause" adopted by the trial court. Although there is no legislative history to guide construction of the statute, we do not believe that the Legislature included the provision permitting a change of birthplace for the limited purpose of concealing disturbing facts about a child's birth. Nor is it necessary for parents to demonstrate unique circumstances that might cause emotional problems for the child. Rather, the desire of parents to exercise control over the circumstances in which an adopted child learns

that she was adopted is "good cause" for ordering a change of birthplace under *N.J.S.A.* 26:8–40.1.

The literature concerning adoption emphasizes the psychological importance of the manner in which a child learns about his adoption. *See* Eldred, *et al., Some Aspects of Adoption in Selected Samples of Adult Adoptees,* 46 *Am. J. Orthopsychiatry* 279, 288 (1976); Schecter, *et al., Emotional Problems in the Adoptee,* 10 *Arch.Gen. Psychiatry* 109, 110, 113–14 (1964); Wieder, *On Being Told of Adoption,* 46 *Psychoanalytical Q.* 1, 19–20 (1977). Experts disagree about when to inform the adoptee, *see id.* at 1–2; but there is no dispute over the desirability of having the adoptive parents inform the child at a time when he is sufficiently mature to accept the information and understand it. *See id.* at 19–20; Schecter, *et al., supra,* at 110. Clinical studies reveal that a child who is told of his adoption by his parents is more likely to react positively than a child who is told by a third person. *Id.* at 113–14; Eldred, *et al., supra,* at 288. Equally important, a child who learns of his adoption before he is emotionally ready is more likely to experience psychiatric problems later. Schecter, *et al., supra,* at 113–14; Wieder, *supra,* at 19–20.

All judicial decisions regarding adoption must be primarily concerned with the best interests of the adopted child. *N.J.S.A.* 9:3–37. In light of the potential for emotional harm documented by these studies, best interests will ordinarily be served by guarding against the chance that the child will learn of his adoption from a third person at an inopportune time. Changing the birthplace on the birth certificate is one means of preventing this. The Legislature's purpose in offering parents this opportunity was to minimize the possibility that the fact of adoption would be communicated as a result of chance rather than parental decision. Because the likelihood that any particular child will suffer harm from accidentally learning of his adoptive status is necessarily speculative, it is usually not subject to proof. Nevertheless, we contemplate that a finding of good

cause will be the rule, not the exception, when a child is adopted at such an early age that he is unaware of his adoption.[3]

The plaintiffs in this case have demonstrated good cause. Although they intend to inform their daughter that she is adopted, they wish to wait until she is more mature. This desire would be a sufficient reason to order a change of birthplace under *N.J.S.A.* 26:8–40.1 if M.C. had been born in the United States. But the statute does not authorize a change for foreign-born adoptees. Therefore, we must address the plaintiffs' equal protection challenge to the statute.[4]

## III

Plaintiffs contend that the ineligibility of foreign-born adoptees for a change of birthplace under *N.J.S.A.* 26:8–40.1 discriminates against aliens in violation of the Equal Protection Clause of the Fourteenth Amendment. They argue that this case is governed by the standard set forth in *Graham v. Richardson,* 403 *U.S.* 365, 91 *S.Ct.* 1848, 29 *L.Ed.*2d 534 (1971), in which the United States Supreme Court applied strict scrutiny to invalidate state laws denying welfare benefits to aliens. Under strict scrutiny, a classification is valid only if it furthers a compelling state interest.

---

[3]Justice Schreiber's concurring opinion states that our interpretation of the good cause requirement renders that phrase meaningless within the statute. *Post* at 169. We disagree. We have defined good cause to include the parents' desire to control the circumstances under which the child learns of his adoption. That obviously does not cover all adoption situations. Where the child is old enough to know that he is being adopted, for example, the parents cannot use this reason to demonstrate good cause. Thus, our reading of that phrase in this case does not make it meaningless.

[4]Plaintiffs also contend that the third paragraph of *N.J.S.A.* 26:8–40.1, *see supra* n.1, affords the State Registrar discretion to issue a birth certificate with a change of birthplace without a court order and regardless of the birthplace of the adoptee. We agree with the Appellate Division's conclusion that this is a tortured reading of the statute.

■ This argument lacks merit for two reasons. First, although state classifications based on alienage ordinarily are "inherently suspect and subject to close judicial scrutiny," *Graham v. Richardson, supra,* 403 *U.S.* at 372, 91 *S.Ct.* at 1852, recent decisions by the United States Supreme Court indicate that not all state restrictions on aliens must withstand strict scrutiny. In *Foley v. Connelie,* 435 *U.S.* 291, 98 *S.Ct.* 1067, 55 *L.Ed.2d* 287 (1978), and *Ambach v. Norwick,* 441 *U.S.* 68, 99 *S.Ct.* 1589, 60 *L.Ed.2d* 49 (1979), the Court upheld New York statutes which place citizenship restrictions on eligibility for employment as a state trooper or public school teacher. The Court employed a rational relationship standard rather than strict scrutiny as in earlier cases involving eligibility for the licensed professions, *Examining Board of Engineers v. Otero,* 426 *U.S.* 572, 96 *S.Ct.* 2264, 49 *L.Ed.2d* 65 (1976); *In re Griffiths,* 413 *U.S.* 717, 93 *S.Ct.* 2851, 37 *L.Ed.2d* 910 (1973) (lawyers). In *Foley* and *Ambach* the Court explained that classifications based on alienage need be only rationally related to a legitimate state interest when a state exercises its inherent power " 'to exclude aliens from participation in its democratic political institutions,' as part of the sovereign's obligation 'to preserve the basic conception of a political community.' " *Foley, supra,* 435 *U.S.* at 295–96, 98 *S.Ct.* at 1070–1071 (quoting *Sugarman v. Dougall,* 413 *U.S.* 634, 647, 648, 93 *S.Ct.* 2842, 2850–2851, 37 *L.Ed.2d* 853 (1973)) (citations omitted). If strict scrutiny applies to some restrictions on aliens but not others, we must look to other sources than the Equal Protection Clause for guidance on the validity of these restrictions.

■ Various provisions of the Constitution treat aliens and citizens differently, "indicating that the status of citizenship was meant to have significance in the structure of our government." *Ambach, supra,* 441 *U.S.* at 75, 99 *S.Ct.* at 1594. Where citizenship is constitutionally significant, governments are permitted to discriminate on the basis of citizenship, subject only to the requirement that the classification be rationally related to a legitimate governmental interest. *See Ambach, supra; Foley,*

*supra;* *Mathews v. Diaz,* 426 *U.S.* 67, 84–87, 96 *S.Ct.* 1883, 1893–1895, 48 *L.Ed.2d* 478 (1976). In these instances, alienage is not an irrelevant personal trait, like race, illegitimacy, or gender, that may not serve as the basis for disadvantaging people in the absence of a weighty governmental interest. *See Trimble v. Gordon,* 430 *U.S.* 762, 767, 97 *S.Ct.* 1459, 1463, 52 *L.Ed.2d* 31 (1977); *Califano v. Goldfarb,* 430 *U.S.* 199, 210–11, 97 *S.Ct.* 1021, 1028–1029, 51 *L.Ed.2d* 270 (1977); *Loving v. Virginia,* 388 *U.S.* 1, 87 *S.Ct.* 1817, 18 *L.Ed.2d* 1010 (1967). Because citizenship is relevant to the basic conception of a political community, the Court has granted states wider latitude to exclude aliens from such activities as voting, elective office, jury service and important nonelective positions held by officers who participate directly in the formulation of public policy. *See Foley, supra,* 435 *U.S.* at 296, 98 *S.Ct.* at 1071. Where a state has exercised its constitutional prerogative to preserve a political community by excluding the participation of aliens, the "State need only justify its classification by a showing of some rational relationship between the interest sought to be protected and the limiting classification." *Id.*

■ This constitutional distinction between citizens and aliens is obviously significant in matters of immigration and naturalization. The federal Constitution confers on Congress the power "To establish an uniform Rule of Naturalization." *U.S.Const.,* art. I, § 8, cl. 4. In the exercise of this power, Congress is permitted to deny benefits to aliens subject only to the requirement that its classifications meet the rational basis test. *See Mathews v. Diaz, supra,* 426 *U.S.* at 83, 96 *S.Ct.* at 1893.

■ We believe that the equal protection analysis applied to federal laws affecting aliens is also applicable to certain state classifications based on citizenship. Under this analysis, state laws that favor citizens over aliens for a particular purpose are subject to rational basis review instead of strict scrutiny if, under federal law, alienage is a permissible basis of classification for that purpose. The state law also must be consistent with

federal policy and place no burdens on aliens not already imposed by Congress. Otherwise, the law would violate the Supremacy Clause, regardless of its validity under the Equal Protection Clause. The Supreme Court has not expressly endorsed this exception to the rule that alienage classifications are subject to close judicial scrutiny. Nevertheless, the exception is supported by the logic underlying the Court's decisions and is consistent with the actual results reached by the Court.[5] We base our conclusion on the relationship between the federal and state governments in the field of immigration and naturalization.

■■■■ The conditions on which aliens are admitted into this country are subject to plenary federal control. The Supremacy Clause prevents states from using federal immigration classifications to impose discriminatory burdens on aliens that interfere with federal policy:

> The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. See *Hines v. Davidowitz*, 312 U.S. 52, 66, 61 S.Ct. 399 [403–404], 85 L.Ed. 581, 586. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid. [*Takahashi v. Fish and Game Commission*, 334 *U.S.* 410, 419, 68 *S.Ct.* 1138, 1142, 92 *L.Ed.* 1478 (1948) (footnote omitted)]

---

[5]Indeed, commentators have gone further, arguing that the validity of state alienage classifications is best analyzed as a question of whether federal immigration and naturalization law has preempted the particular state law under the Supremacy Clause, without referring to different levels of scrutiny under the Equal Protection Clause. *See* Perry, *Modern Equal Protection: A Conceptualization and Appraisal*, 79 *Colum.L.Rev.* 1023, 1063–64 (1979); Note, *The Equal Treatment of Aliens: Preemption or Equal Protection?*, 31 *Stan.L.Rev.* 1069, 1089–90 (1979); Note, *State Burdens on Resident Aliens: A New Preemption Analysis*, 89 *Yale L.J.* 940, 948–53 (1980).

Under this standard, for example, a state may not adopt classifications used by the federal government "to prevent lawfully admitted aliens within its borders from earning a living in the same way that other state inhabitants earn their living." *Id.* at 418–19, 68 *S.Ct.* at 1142. *See also Otero, supra; In re Griffiths, supra.* Similarly, a state cannot impose additional terms and conditions for the residence of aliens in the state, such as a requirement that aliens carry registration cards. *Hines v. Davidowitz,* 312 *U.S.* 52, 61 *S.Ct.* 399, 85 *L.Ed.* 581 (1941). "[W]here the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation . . . , states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law . . . ." *Id.* at 66, 61 *S.Ct.* at 403–404. State laws restricting aliens from engaging in ordinary private occupations or requiring special registration procedures are invalid because they conflict with the federal policy that aliens will enjoy the same rights as citizens, subject only to the conditions sanctioned by federal law. *See Takahashi, supra,* 334 *U.S.* at 419 n.7, 68 *S.Ct.* at 1143 n.7; 42 *U.S.C.A.* § 1981 (1974).

However, state regulations affecting aliens are permissible under the Supremacy Clause if they are harmonious with the federal scheme and do not impose additional burdens not contemplated by Congress. *See, e. g., De Canas v. Bica,* 424 *U.S.* 351, 357–58 & n.6, 96 *S.Ct.* 933, 937–938, & n.6, 47 *L.Ed.*2d 43 (1976). We see no reason why such regulations should not also be valid under the Equal Protection Clause. We hold that a state may deny benefits to aliens if the discrimination against aliens is rationally related to the state's constitutional obligation to avoid conflicts with federal law and imposes no burdens on aliens not anticipated by Congress. Otherwise, a state would be forced to deny a benefit to its citizens simply because the Supremacy Clause prevented it from extending the benefit to aliens. We do not believe that the Equal Protection Clause commands that result.

Judged according to this standard, *N.J.S.A.* 26:8–40.1 does not discriminate against aliens in violation of the Equal Protection Clause. Congress has created an exclusive scheme for the administration of immigration and naturalization. Section 1421(d) of 8 *U.S.C.A.* states that "[a] person may be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter, and not otherwise." The administration of naturalization laws depends on the accuracy of birth records because persons are classified according to their place of birth. *See, e. g.,* 8 *U.S.C.A.* § 1401 (1970). A birth certificate indicating that a person was born in the United States is *prima facie* evidence of United States citizenship. *See* 8 *C.F.R.* § 235.10(b) (1980); 22 *id.* § 51.43(a). The proof of citizenship for foreign-born children who are citizens at birth under 8 *U.S.C.A.* § 1401(a) is a certificate of citizenship issued by the Attorney General of the United States. 8 *U.S.C.A.* § 1452 (1970). A foreign-born child who must comply with the naturalization laws to become a citizen can prove his United States citizenship only through a certificate of naturalization issued under 8 *U.S.C.A.* § 1449 (1970).

The New Jersey statute is designed to avoid conflicts with this scheme. Indeed, the State could not change the birthplace on birth certificates of foreign-born persons consistently with the Supremacy Clause, since this would interfere with the federal government's methods for proving citizenship. Furthermore, the State has not imposed an additional burden on foreign-born persons; federal law expects them to have birth certificates indicating their real place of birth. Therefore, since *N.J.S.A.* 26:8–40.1 is rationally related to the State's obligation to conform to federal naturalization law and imposes no additional burdens on aliens, it does not deny aliens equal protection and is valid under the Supremacy Clause.

There is a second reason why plaintiffs' argument is unpersuasive. On its face, *N.J.S.A.* 26:8–40.1 does not discriminate on the basis of citizenship, unlike the laws considered in *Graham v. Richardson, supra,* and other cases in which the Supreme Court

has applied strict scrutiny, *see Nyquist v. Mauclet,* 432 *U.S.* 1, 7–12, 97 *S.Ct.* 2120, 2124–2127, 53 *L.Ed.*2d 63 (1977); *Examining Board of Engineers v. Otero, supra,* 426 *U.S.* at 601–06, 96 *S.Ct.* at 2280–2283; *In re Griffiths, supra,* 413 *U.S.* at 721–29, 93 *S.Ct.* at 2154–2859; *Sugarman v. Dougall, supra,* 413 *U.S.* at 641–49, 93 *S.Ct.* at 2847–2851. Rather, eligibility for a change of birthplace depends on whether a child was born in the United States. Since some children born outside this country are United States citizens at birth, notably the children of American citizens, 8 *U.S.C.A.* § 1401(a)(3)–(5), (7) (1970), the group of persons ineligible for the benefit conferred by *N.J.S.A.* 26:8–40.1 includes citizens as well as aliens. This group as a whole lacks the traditional indicia of "suspectness," such as a history of prejudice and political isolation, that justify "heightened judicial solicitude." *Graham v. Richardson, supra,* 403 *U.S.* at 372, 91 *S.Ct.* at 1852.

▮ Because foreign-born adoptees are not a suspect class, *N.J.S.A.* 26:8–40.1 need not satisfy the test of strict scrutiny even if that were otherwise the appropriate standard of review for this kind of alienage classification; it need only satisfy the standard of minimum rationality ordinarily applied to legislation concerning social welfare. *See Dandridge v. Williams,* 397 *U.S.* 471, 485, 90 *S.Ct.* 1153, 1161–1162, 25 *L.Ed.*2d 491 (1970). Here the Legislature has classified on a reasonable basis; the classification of those eligible for a change of birthplace is carefully drawn to avoid interfering with the federal government's administration of laws concerning naturalization and citizenship.

As discussed above, *supra* at 166, the federal government relies on the accuracy of birth certificates by treating a certificate indicating birth in this country as *prima facie* evidence of United States citizenship. *See* 8 *C.F.R.* § 235.10(b) (1980); 22 *id.* § 51.43(a). If New Jersey were to authorize a change of birthplace when a foreign-born child is adopted, it would be conferring *prima facie* evidence of United States citizenship which could be used fraudulently. Persons relying on this birth

certificate would have no way of knowing that the certificate is not proof of the child's citizenship. The desire to avoid interference with naturalization procedures is a reasonable basis for limiting eligibility for change of birthplace to adopted children born in the United States. Therefore, *N.J.S.A.* 26:8–40.1 does not violate the Equal Protection Clause of the Fourteenth Amendment.

In short, the ineligibility of foreign-born adoptees for a change of birthplace under *N.J.S.A.* 26:8–40.1 does not violate the Equal Protection Clause and is compelled by the Supremacy Clause. Although we find that plaintiffs have shown good cause for a change of birthplace, we must nevertheless affirm the denial of their motion because the statute does not authorize the change.

Accordingly, we modify the judgment of the Appellate Division and, as modified, we affirm.

SCHREIBER, J., concurring.

The threshold question is whether the statute, *N.J.S.A.* 26:8–40.1, applies to an adopted child who was not born in the United States. The answer is self-evident from the statutory language. The act relates only to persons "born in the United States."

The next inquiry necessarily is directed to whether the statute is violative of the Equal Protection Clause of the Federal Constitution. Criteria for measuring whether the Equal Protection Clause has been satisfied depend on the nature of the subject matter involved. Ordinarily the rational basis test (a classification rationally related to a legitimate state objective) is used to make this determination. However, when the subject matter is a "fundamental right" or a "suspect class," the statute may be subject to "strict scrutiny" or to a showing of substantial relationship to governmental objectives. *Craig v. Boren*, 429 *U.S.* 190, 97 *S.Ct.* 451, 50 *L.Ed.*2d 397, reh. den. 429 *U.S.* 1124, 97 *S.Ct.* 1161, 51 *L.Ed.*2d 574 (1976).

Since the classification involved in this case includes all persons born in foreign countries, irrespective of citizenship, no suspect class is implicated and the statutory discrimination must be upheld "if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 *U.S.* 420, 81 *S.Ct.* 1101, 6 *L.Ed.*2d 393 (1961). A rational basis exists, for discovery of facts in a birth record may be necessary to authenticate a right to vote, hold office or be a state employee. See *Ambach v. Norwick*, 441 *U.S.* 68, 99 *S.Ct.* 1589, 60 *L.Ed.*2d 49 (1979). Moreover, the statutory exception is appropriate to avoid conflict with the federal laws governing immigration and naturalization. See *ante* at 165. The accuracy of the birth record could affect determinations involving establishment of the facts recited therein. Under *Evid.R.* 63(17) an official record (presumably a birth certificate may be so categorized) is admissible to prove the content of that record. *Vanderbilt v. Mitchell*, 72 *N.J.Eq.* 910, 913 (E. & A. 1907). A legitimate state interest is, therefore, furthered by restricting the right to change the place of birth to those born within the United States.

Since the child in the instant case was not born in the United States, it is not necessary to consider whether on this record the plaintiffs have satisfied the statutory requirement that "good cause" be shown. That condition must be met before the court can direct that the certificate be amended. No legislative history illuminates what the Legislature intended by "good cause." If, as the majority states, a parent's desire "to exercise control over the circumstances in which an adopted child learns" of the adoption is the type of reason which is sufficient, then "good cause" as a condition precedent becomes almost meaningless. Perhaps that is as it should be, despite the statutory interpretation principle denigrating superfluous language. See *In re Revision of Rates Toms River Water Company*, 82 *N.J.* 201, 211 (1980) (statutory construction rendering language superfluous "must be avoided"). In any event the issue need not be addressed in this case.

I concur with the majority in affirming the judgment of the Appellate Division.

Justice CLIFFORD joins in this opinion.

CLIFFORD and SCHREIBER, JJ., concurring in the result.

*For modification and affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal* —None.